## HENRY PETERS et al. v. STATE.

No. A-10012. March 17, 1943.

(135 P. 2d 355.)

Wayne E. Wheeling and Tellegen & Miskovsky, all of Oklahoma City, for plaintiffs in error.

Mac Q. Williamson, Atty. Gen., and J. Walker Field, Asst. Atty. Gen., for the State.

DOYLE, J. The information in this case, filed in the court of common pleas of Oklahoma county February 24, 1940, charged that on the 23d day of February, 1940, in Oklahoma county, Henry Peters and Sammy Kutz, did then and there wilfully and unlawfully maintain and operate a certain one-story frame building located at 30th and South Eastern streets and adjacent to Oklahoma City, where intoxicating liquors, towit, whisky, was kept, bartered, sold and given away to divers persons unknown, who were permitted to congregate therein for the purpose of buying, receiving and drinking the said intoxicating liquor, all to the common nuisance of the public, contrary to, etc.

On the trial the jury returned a verdict finding "the defendant, Henry Peters, guilty as charged in the information, and fix and assess his punishment at confinement in the county jail for a period of 30 days and a fine of $50.00; and find the defendant, Sammie Kutz, guilty as charged in the Information, and fix and assess his punishment at confinement in the county jail for a period of 30 days and a fine of $50.00."

October 14, 1940, their motion for new trial was overruled and judgments rendered in accordance with the

verdict. From these judgments the defendants bring the case here on appeal for review. The case-made was filed in this court February 10, 1941.

The errors assigned are that the court erred in admitting incompetent and prejudicial evidence, and allowing the jury to consider the same, over the objections of the defendants; that the verdict of the jury was not supported by the evidence and is contrary to law, and the court erred in overruling the defendants' demurrer thereto; and that the court erred in overruling the defendants' motion for a new trial.

In support of the assignments counsel for plaintiffs in error have filed an extensive brief.

The Attorney General's brief begins with the statement that:

"This is an appeal from a judgment and sentence of the court of common pleas of Oklahoma county, without a jury."

And in conclusion states:

"The court, sitting as a jury in this case, heard all the evidence offered in connection with the Mistletoe Tavern, and as there was no evidence whatever offered on the part of the defendants or either of them, it is submitted that the court has a right, in arriving at its decision."

To better understand the assignments it will be necessary to give a brief statement of the facts disclosed by the testimony and a substantial statement of the testimony of the witnesses for the state.

It appears that on the date alleged, four state officers visited the place described in the information. They observed three men sitting in a booth. These men were the first three witnesses called by the state. Each in sub-

stance testified that they were at this place for the purpose of repairing a light plant; that after working on the light plant, one of them, Jim Peck, who had a pint of whisky with him, invited the other two men to have a drink, that the men were sitting in a booth when the officers came into the place.

Mack Renshaw testified that on February 23, 1940, Jim Peck called him to go to Thirtieth and South Eastern to work on a light plant; this was the second time he worked on the plant; that when the officers, Goldsmith, Beck, Seran, and West, came in he was sitting in a booth, and Jim Peck had a pint of whisky.

Cross-examined he stated:

"I don't know where Jim Peck got it, I did not purchase any whisky at any time from either of these defendants."

Earl Warr testified that "Jim Peck, with the American Electric Company, was installing a new magneto in the light plant there, they brought one out, it did not fit, so he called him up to borrow one and I brought him one. I know Henry Peters and Sammy Kutz, I have been to that place quite often, it is out near where I work, I pass there often, I do not know what business Sammy Kutz is in that place," and back in February he took a drink there.

Cross-examined he stated:

"I am pretty sure Mr. Peck had the pint of whisky in his car with him, he brought it there with him, I know that as a fact, when the officers came in I believe it was sitting on the side between Jim Peck and I."

On redirect he testified as follows:

"Q. Did you yourself ever buy any whisky there? Objection overruled. The Court: He can answer that yes or no. A. Yes."

188

On re-cross examination:

"The Court: Now, as I say, for the purpose of the jury and the record, the case was filed on the 24th day of February, 1940. Now, if the sale that you are talking about was prior to that time or in the immediate priority of that time, the evidence would be competent. If it has been since that time, it is not competent. Can you enlighten us on that? A. No, sir. Just like I say, I had forgotten all about it, forgot about the deal, and I don't know whether it was four or six months ago. I don't remember when."

Jim Peck testified:

"I was at work on the light plant, Thirtieth and South Eastern, with two other men, Renshaw and Warr, the officers came in raided, and looked around to see what they could find, and we asked to leave, and they said, 'No, stay around, we are looking for whisky.' Q. Did they find any whisky? A. No, sir. Q. Did you boys have any whisky? A. Yes, sir. Q. Where was that whisky? A. It was in my pocket, and I set it down by the side of me when they came in. Q. Did you bring that whisky there, or did you receive it there? A. I think I had that with me. Q. Prior to the 23rd of February, 1940, the day of this instance, had you ever bought any whisky out there? A. Not there, that I know of."

On cross-examination he stated:

"I was out on the job, when we got through and the boys helping me, I says, 'Come in, I believe I will give you a drink, you boys have been pretty good', and we went inside and sat down. I had that in my unionalls."

R. A. West testified that he had occasion to go to Thirtieth and South Eastern to a place known as Mistletoe Tavern, a frame building, the only things they had for sale in that place were Coca Cola, 7Up, Ginger Ale and things of that sort and no foods. "When we went in three men were sitting in a booth and Peters was behind

the bar. The men were drinking mixed drinks, whisky." Peters said that he did not sell it to them. Handed a paper witness was asked what it was and answered: "It was a whisky price list that he found back of the bar." Defendants' objection overruled. Exception. Exhibit 1 admitted. Handed State's Exhibit 2, stated: "That is a retail liquor dealers' stamp" he found there in the name of Medlock Harris. Admitted over defendants' objection and exception. Exhibits 1 and 2 are now handed to the jury.

He further testified that they picked up all the records they could find that mentioned anything about whisky at all, and there was quite a lot of them. That they had made several prior visits, during the previous four months, but they did not find any whisky.

He further testified that he had a conversation with Peters about the place, and he said that it was his place, he was running it. That in a conversation with Peters at a later date, Peters did not tell him whether the ownership was that way at this particular time or not, and at a later date he said he had never owned the place.

Over the defendants' objection he further testified that he found a book there on this particular date, marked State's Exhibit 3 and asked what it was, answered: "This is an account showing how much whisky different people bought." In other words, it is an account book, showing customer purchases, also identified state's exhibits 5 and 6 as an envelope containing papers that had whisky accounts in it. That he knew the reputation of this place as being a place where people congregated for the purpose of buying intoxicating liquor and drinking it, and that reputation was bad.

Counsel for the state again offered in evidence ex-

hibits 3, 4, 5 and 6. Defendants' objections to the same as being incompetent, irrelevant, and immaterial and not properly identified as to dates in connection with the time of the alleged offense, in nothing to indicate, except the month and the day, and not properly identified as to whether or not either of these defendants made any of the entries signified in those books or the state exhibits.

"The Court: Objections overruled, but will admit them for the jury's consideration. Exceptions allowed."

On cross-examination he was asked to look through this ledger, state's exhibit No. 3, and state "whether or not you know whose writing is in these books or what date the entries therein relate to. if you know."

"A. I do not know whose writing it is. Q. Mr. West, from what you saw there in state's exhibit No. 3 and No. 4, is there anything to indicate that those books belonged to either of the defendants in this case? A. Nothing in the books."

He further stated that his information about the reputation of the Mistletoe Tavern was not entirely gained from other officers. That it was also from the first three witnesses for the state.

Witness, recalled after the noon hour recess, stated that he had investigated these records and on page 134 it shows "wholesale" and dated, "December 25, 1939"; that he did not know who owned the ledger, and did not know whose handwriting it was; that the names of the defendants do not appear on any of the exhibits.

Handed and asked as to each exhibit, if he could find the name of either of the defendants thereon, answered, "I do not".

"Mr. Stark: Objected to as incompetent, irrelevant and immaterial. The Court: I am going to exclude all these records. Mr. Daugherty: To which we want to take

an exception for the reason it is for the jury to determine. The Court: The jury has heard that these records were found in this place of business, and these records have not been identified properly, and nothing to be considered by the jury as against the defendants; therefore, all of those records as seized by this officer in this place of business will be excluded from the jury's consideration. With this instruction to the jury the only evidence that you are to consider about these records is that this officer found them in this place some where, the contents of them are excluded."

Mr. Daugherty asked that the jury be excused, saying:

"Don't believe I understand the court's ruling. The Court: They are not identified and the court has ruled on it, and the jury understands what I mean. The only thing that I want the jury consider is that this officer found those records in this place. The contents of them are not properly identified as against the defendants. Mr. Daugherty: Well, I have a little bit more identification I can make, I can show these defendants wrote these. The Court: Proceed."

Thereupon Mr. Daugherty proceeded to qualify the witness West as a handwriting expert, and over the defendants' objections testified as to his qualifications as a handwriting expert and further testified:

"That the handwriting on pages 134 and 135 of exhibit 4 was in his opinion the handwriting of the defendant, Henry Peters."

Objection overruled. Exception.

"The Court: It is not binding on the defendant, Sammy Kutz, gentlemen of the jury."

Cliff Goldsmith testified that on February 23, 1940, he saw three men sitting in a booth, drinking mixed drinks, they were using a pint of whisky, that on several occasions he had been to this place, but did not know who was

the owner of the place. Sammy Kutz said that it had been his place, but that he had sold it, but did not say who he sold it to; that he asked Henry Peters if he had any whisky there and he said "No", and he asked Peters if he owned the place and he just laughed and shook his head no. That he probably saw Henry Peters there a week or two before that, and saw various people come in and order whisky; Peters would always say that he did not have it. In this place they do not have beer, all they have is pop, 7Up and various other bottle goods that can be used as chasers.

"Mr. Stark: We object to that voluntary statement: The Court: Now, don't give this jury your opinion about it. You are an officer, of course, and everybody you arrest you think is guilty. You tell this jury the facts, what occurred out there, and what you saw. A. I saw Sammy Kutz in this place about two or three months prior to that time, however, I did not get any whisky there that time, I had a conversation with Sammy Kutz since that time, he spoke of hiring a man, he said Peters and Midkiff or Medlock were paid $25 a week salary. That he knew the reputation of the place with reference to being a place where people are permitted to congregate for the purpose of buying and drinking whisky, and that reputation was bad."

On cross-examination he was asked if he could name persons that told him about this place, besides police officers, and answered: "Yes, I can name two people that are bootleggers that told me about it. Carl Knott and Hubert Knott," and the department had received anonymous letters about the place.

He stated that the state's exhibits were picked up in the Tavern, but he didn't know who picked the particular cards up.

"Mr. Stark: The defendants renew their objections to the introduction of the exhibits as being incompetent,

irrelevant and immaterial and not properly identified with the defendants or either of them. The Court: Well, the jury will take that into consideration. I think it will probably help the jury in some manner in their consideration. Exceptions allowed."

Milo Beck testified:

"I was with the officers, I don't remember whether Sammy was there or not, Henry Peters was there, I have been there several times on previous occasions; I know the reputation of the place relative to it being a place of public resort, where whisky and other liquors were kept and sold. That reputation is bad. We found some fellows sitting in there with a bottle, drinking. On another occasion prior to February 23rd, I found whisky there, our department has the reports on those occasions. The Court: Now, answer the question, Mr. Beck, you have been a sheriff and you have been a witness many, many times, you know how to answer questions, and you answer the questions asked and not give any dissertation about Red Phillips' regime. Well, I don't know the dates, we just went and raided the place and on any of these raids we did not find any whisky, the only time was when these three fellows were sitting there drinking out of the bottle."

The state rested its case and the defendants each demurred to the evidence as being insufficient to support the charge in the information and moved the court for a directed verdict of not guilty, which was overruled. Exceptions allowed.

The admission of the state's exhibits over the objections of the defendants was prejudicial to the substantial rights of the defendants.

To render books accounts admissible in evidence, they must be shown to have been correctly kept, to have been kept in the ordinary course of business, to have been made at or reasonably near the time of the transaction,

to be books of original entry, and shown to be relevant and material to the issue.

In State v. Rule, 11 Okla. Cr. 237, 144 P. 807, 813, we said:

"The statutory rule is found in section 5114, Rev. Laws [1910 (12 O. S. 1941 § 501)] which provides:

" 'Entries in books of account may be admitted in evidence, when it is made to appear by the oath of the person who made the entries, that such entries are correct, and were made at or near the time of the transaction to which they relate, or upon proof of the handwriting of the person who made the entries, in case of his death or absence from the county, or upon proof that same were made in the usual course of business.'

"We are of the opinion that all entries in the book offered in evidence relating to the House legislative printing, were admissible, not only as independent evidence of facts forming a part of the res gestae, but also as declarations or admissions made by the defendant against his interest. We certainly know of no decision, rule of evidence, or established principle that requires the exclusion of such evidence when offered in connection with the testimony of the persons who made the entries therein, that they were correct. The constitutional provision (section 28 [20] Bill of Rights) giving the accused the right to be confronted with the witnesses against him does not apply to the proof of facts in their nature essentially and purely documentary." And see Appelget v. State, 33 Okla. Cr. 125, 243 P. 251.

The Supreme Court in Sharp v. Pawhuska Ice Co., 90 Okla. 211, 217 P. 214, held:

"To render book accounts admissible in evidence, they must be shown to have been correctly kept, to have been kept in the ordinary course of business as an essential part of the system of business, to have been made at or reasonably near the time of the transaction, to be books

of original entries, and shown to be relevant and material to the issue."

Obviously it was error to overrule objections taken to, and the motions to strike and withdraw from the jury, the state's exhibits 1 to 6.

The information in this case was based upon that part of section 2616, St. 1931, 37 O. S. 1941 § 73, which declares:

"And all places where any such liquor is kept or possessed by any person in violation of any provision of this act; and all places where persons congregate or resort for the purpose of drinking any such liquor, are hereby declared to be public nuisances."

It is also contended that the evidence was insufficient to support the verdict and judgments of conviction. Citing Barngrover v. State, 28 Okla. Cr. 22, 229 P. 301; Sullivan v. State, 36 Okla. Cr. 95, 252 P. 442; Bunch v. State, 53 Okla. Cr. 430, 12 P. 2d 704; Ornsby v. State, 53 Okla. Cr. 445, 13 P. 2d 596; Young v. State, 56 Okla. Cr. 375, 40 P. 2d 686; Tarbutton v. State, 57 Okla. Cr. 442, 48 P. 2d 877; Handley v. State, 68 Okla. Cr. 183, 96 P. 2d 546; Davis v. State, 71 Okla. Cr. 82, 108 P. 2d 200.

In Barngrover v. State, supra, [28 Okla. Cr. 22, 229 P. 302], it is said:

"The corpus delicti cannot be proven by reputation alone. It would be a dangerous and unwarranted assumption of authority for this court by judicial construction to read into this public nuisance statute a proviso that the keeping or maintaining of a public place where liquors are sold or consumed could be established by reputation alone. The true character and the reputation of a place might be quite different. A bad reputation might be founded on mere rumor. Insidious slanderers or talebearers might give to a person or place a bad reputation

entirely undeserved. Reputation alone, without some evidence of a positive nature, should not be held sufficient to establish a specific fact or condition.

"Quoting from the state's brief in Patterson v. State, [17 Okla. Cr. 495], 190 P. 271, this court said:

" 'The evidence, attempting to show that persons congregated and resorted on the defendant's premises for the purpose of drinking such liquors, wholly fails. The evidence as to the general reputation of the premises is without force.' "

In Young v. State, 63 Okla. Cr. 196, 74 P. 2d 392, 394, it is said:

"It appears that the information is based upon that part of section 2616, Okla. St. 1931 (37 Okla. St. Ann. § 73), which declares:

" 'and all places where any such liquor is kept or possessed by any person in violation of any provision of this act; and all places where persons congregate or resort for the purpose of drinking any such liquor, are hereby declared to be public nuisances.'

"In Tarbutton v. State, 57 Okla. Cr. 442, 48 P. 2d 877, 878, it is said:

" 'It is true that the word "reputation," when unqualified, in common parlance means general reputation. What peace officers say to one another about a man's place is not reputation. Reputation is what people generally in a community say of a place.

" ' " "Reputation' is said to be the common knowledge of a community," and " 'Reputation' is defined to be concurrence of many voices to the same fact." 7 Words and Phrases, First Series, p. 6119.'

"In the case of Bunch v. State, 53 Okla. Cr. 430, 12 P. 2d 704, this court held:

" 'Where one is charged with keeping a place in such manner as to constitute a public nuisance, its general rep-

utation as such may be shown; but evidence of reputation alone will not support a conviction.'"

In Brennan v. State, 32 Okla. Cr. 284, 240 P. 1084, 1085, we said:

"The general rule is that the party calling a witness certifies to his credibility."

Assuming as true the testimony of the first three witnesses for the state, it was shown that the witness Peck and his two assistants had come to the place to repair the light plant, and it is undisputed, as shown by their testimony, that the foreman, Peck, brought a portion of a pint of whisky there, and after completing the work, Peck proposed to give the other two witnesses a drink of the same, and about that time the officers came into the place and took the bottle from Peck.

The testimony of the three officers is to the effect that they had raided this place four or five times in the preceding four or five months and never at any time had found upon the place any intoxicating liquor, and there was no evidence showing that persons congregated there for the purpose of drinking intoxicating liquor, other than the three states' witnesses who had come there upon legitimate business. There is no evidence that intoxicated persons ever went to or came from the premises, or that there was any disturbance thereabout, and there is no competent evidence in the record which is sufficient to connect either of the defendants with the offense charged.

It follows from what has been said that the evidence is wholly insufficient to support the verdicts of the jury finding the defendants guilty, and for this reason the trial court erred in overruling the defendants' motion for a new trial.

The judgments of the trial court herein are reversed

and the cause remanded, with direction to dismiss the case.

BAREFOOT, J. I concur only in the conclusion reached that this case should be reversed and remanded.

JONES, P. J., dissents.