## COX v. OKLAHOMA TAX COMMISSION.

No. 32304.   April 16, 1946.

*168 P. 2d 634.*

Irvine E. Ungerman, of Tulsa, for plaintiff in error.

E. L. Mitchell and W. F. Speakman, Attorneys for Tax Commission, for defendant in error.

BAYLESS, J.   J. M. Cox appeals from an order of the Oklahoma Tax Commission refusing his application for an "off premises" retail beer dealer's license.   The record consists entirely of his testimony and various written instruments and a map or plat of the premises and surrounding locality.   The commission gave no reason for the re-

fusal of the application. Here, it is argued by Cox that he met all of the personal, business, and statutory tests that are conditioned for the granting of such a license, and asserts that his application was denied arbitrarily and by erroneously judging his rights by the statutory conditions attached to the granting of a retail beer dealer's license to sell beer for consumption on the premises. Commission argues that Cox has no absolute right to have a license issued to him, but on the contrary the commission has a discretion vested in it by statute and Cox can prevail on appeal only by showing an abuse of discretion.

In addition to this, commission charges Cox with the adoption of a subterfuge to obtain this license. It points out that the locality where Cox intends to sell beer in the original package for consumption off of his premises has the following characteristics: (1) It is outside the limits of any town or city. (2) One man owns the entire tract of land. (3) At the north end of the tract there is a public dance hall. (4) Just south of the dance hall is a public swimming pool and a confectionery. (5) Just south of this is a small space of ground onto which Cox moved a small, one-room house about 20 x 20 (it almost completely covers the leased ground). (6) He proposes to sell beer at retail in the original package to be consumed off his premises. And (7) his business house is only 182 feet from the entrance to the dance hall. All of these structures are located 100 feet and more away from the street or road in their front, but all are served by one large, commonly used space for driveway and parking. Commission argues that given this set-up as a basis, the licensing of the sale of beer under these conditions would be a violation of 37 O.S. 1941 § 211 et seq., and other laws regulating the sale of beer. It points out that the purpose of the Legislature in enacting various statutes was to regulate the sale of beer at retail, especially with relation to dance halls, to minors and schools and churches, and if Cox can obtain a

license to sell beer in package within 1,000 feet of this dance hall when he could not under like conditions obtain a license to sell beer at retail for consumption on his premises, the legislative will would be thwarted. Cox says, to counter this, that the Legislature has specified the terms and conditions that shall govern the issuance or refusal of a license for the various types of dealership authorized, and that each type of dealership is governed by the particular terms and conditions enumerated for it and not by what may apply to another.

We recognize the applicability of this argument to the facts. The restrictions against issuing a license to sell beer for consumption "on premises," sec. 211 and sec. 212, are not expressly mentioned in 37 O.S. 1941 § 162e(c), providing for the issuance of licenses to a "retail dealer who sells such beverages in original packages and not for consumption on the premises." Also, it is to be observed that the sale of beer "in original packages and not for consumption on the premises" is not expressly mentioned or restricted by the provisions of the so-called "Beer-Dance Hall" Law, H.B. 198, 1943 S.L. 108 (37 O.S. 1941 §§ 211-218). This may have resulted from the realization that there is no practical method of preventing the taking of beer in the original package a considerable distance from the place of purchase to a dance hall.

On the other hand, the provisions of section 211, supra, may control by construction under the given facts. It reads:

". . . It shall be unlawful . . . to sell or otherwise dispense beverages (so defined) . . . on premises wherein public or private dancing is conducted or permitted, whether said dancing is under the same or different ownership and management. For the purpose of this Act the word 'premises' shall mean and include the real property or building, and any adjoining property connected thereto by any private passageway, on or in which such dancing is conducted or permitted."

It is significant that the sale or dispensing of beer is not modified or qualified by whether the beer is in or out of the original package. It is further significant that the Legislature adopted its own definition of "premises." Thus, beer may not be sold or dispensed on "premises" (as defined) where public or private dancing is conducted or permitted, whether the beer is in or out of the original package, and consumption on or off the premises is not made a test or condition.

The legislative definition of premises is deliberately broadened for the purposes of the act and in this respect conforms to the usual practice of the legislative bodies and courts in defining premises for similar purposes. See Parente v. State Bd., 1 Cal. App. 2d 238, 36 P. 2d 437; Treasure Island Co. v. State Bd., 19 Cal. 2d 181, 120 P. 2d 1; Fenson v. State, 273 N.Y.S. 751, 152 Misc. 446; Ratzell v. State, 27 Okla. Cr. 340, 228 P. 166; 33 Words & Phrases (Perm. Ed.) 345. The first consideration of the facts herein to see where the definition of premises fits discloses that one man owns this entire block. The next is that all of the north boundary, and the west boundary to the point where it adjoined Cox's lot or building, is under one permanently affixed wire fence. Also, all of the activities carried on in the block area use in common the relatively large open space between them and the street on the east for parking space for those attending any or all of the facilities. We think it constitutes premises within the meaning of the statute, if connected by a "private passageway."

"Private passageway" or "private way," as defined in 33 Words & Phrases (Perm. Ed.) 726, has in common some aspects that govern here. The word "private" connotes privately owned as differentiated from publicly owned, or dedicated to public use voluntarily or by eminent domain. It likewise implies a way of convenience for those engaged in common or related activities in a given area. We think the close proximity of the proposed package store

and the dance hall, and the access from one to the other over this commonly used space, without necessity of resort to the public streets or roads, and the private ownership of the land justifies the designation of a "private passageway" within the meaning of the statute.

Therefore, we think the license was properly refused under section 211, supra.

The order appealed from is affirmed.

GIBSON, C.J., and OSBORN, CORN, WELCH, DAVISON, and ARNOLD, JJ., concur. HURST, V.C.J., and RILEY, J., concur specially.

RILEY, J. (concurring specially). J. M. Cox, a licensee for the sale of nonintoxicating beverages, appeals from an order of the Oklahoma Tax Commission denying him a license to sell beer.

The license to sell beer, by the majority opinion, is denied, not because beer may be lawfully sold in Oklahoma, but by reason of the relation of a statute as to the sale of nonintoxicating beverages within 1,000 feet of a place where dancing is permitted (37 O.S. 1941 § 211) and its connection with 37 O.S. 1941 § 162e(c), applicable to the payment of a license tax and the issuance of a permit to sell nonintoxicating beverages in original packages and not for consumption on the premises.

Thus, for the first time within the State of Oklahoma, the Supreme Court assumes, without deciding, that the sale of beer within Oklahoma is legal.

Appellant contends that denial of the permit is arbitrary; that the order of the Tax Commission is the result of the exercise of a discretion not by law vested; that the order is contrary and in violation of law.

Appellant's one assignment of error is predicated upon an alleged right "to sell 3.2 beer" in original packages. Appellant has attached to his application

for permit, a lease to real estate acquired by him as a location for the proposed sale of beer. He provides himself with a malt beverage stamp. Eleven times in testimony appellant made reference to his sale of beer. The majority opinion assumes, without deciding, that beer may be legally sold in Oklahoma. This, I shall controvert. In the meantime, I shall attempt to show misconstruction and misapplication of the statutes relating to the issuance of permits to sell in original packages and not for. consumption on the premises, nonintoxicating beverages (exclusive of beer), Title 37 O.S. 1941 § 162e(c), and to establish that H.B. 198, S.L. 1943, p. 108 (37 O.S. Supp. 1945 § 211), relates only to the sale of nonintoxicating beverages (exclusive of beer) within a limited distance of a place where dancing is permitted, generally, but does not govern the sale of nonintoxicating beverages in original packages and not for consumption on the premises—near places where dancing is permitted, outside the limits of any incorporated city or town—§ 212.

Three different types of retailer, dealers' permits and three different amounts of license fees are prescribed by the nonintoxicating beverage act. 37 O.S. 1941 § 162e(c). They are: (1) on draught and for consumption on or off the premises, $100; (2) in original packages only, for consumption on and off the premises, $50; (3) in original packages and not for consumption on the premises, $10.

Herein, the latter amount of license tax has been paid and the latter permit is sought. The statute provides that "upon full compliance with the provisions of this Act" the.permit "shall be issued and renewed in the discretion of the Tax Commission." While a discretion is provided by the statute as to the grant or refusal of the permit, the State Tax Commission is without guide for its exercise. It may use one basis for action in one case and another in another. It may act capriciously or arbitrarily. Hence, there is in law no discretion at all, and upon

compliance, the applicant is entitled to a license. Anno. 92 A.L.R. 400; 12 A.L.R. 1435.

The majority opinion quotes a part of section 211, supra, and by use of asterisks causes it to read ". . . shall be unlawful . . . to sell or otherwise dispense beverages (so defined) . . . on premises where public or private dancing is conducted or permitted, . . ." Section 211 is general in its terms and has no relation to the sale or dispensing of nonintoxicating beverages outside a city or town near a place where dancing is permitted. Section 212, constituting section 2 of the Laws of 1943, page 108, applies to the particular location here involved. It reads:

"It shall be unlawful . . . to sell or otherwise dispense *for consumption on the premises,* beverages (so defined) . . . at any place in this state *outside the limits of any incorporated city and town* where the public entrance or entrances to which place are within 1,000 feet of the nearest public entrance to premises outside the limits of any incorporated city or town, wherein public or private dancing is conducted or permitted."

No reason can be assigned for the enactment of section 212, supra, unless the provisions thereof were intended by the Legislature to govern in the issuance of such permits as here involved.

It appears from answer brief of Oklahoma Tax Commission that denial of permit was based upon the location of the proposed place of sale of the nonintoxicating beverage, as being outside the limits of city or town and its proximity to a dance hall, separately owned and operated, and the relation of section 211, supra, to the particular governing section, 212, supra.

A casual examination of the nonintoxicating beverage dance act, supra, reveals that the provisions of section 212, supra, do not prohibit the sale of nonintoxicating beverages in original packages, not for consumption on the premises, near or within any distance

of any dance hall or place where dancing is permitted. The prohibition of section 212 extends only to the sale of such beverages "for consumption on the premises."

Possibly the legislatively-declared nonintoxicating beverages outside of a city or town can be carried near or far in original packages, whereas in stomachs they might not. To say the least, as to the sale of nonintoxicating beverages outside of cities or towns, *in original packages,* the Legislature authorized the issuance of a license and sale. It did not vest any discretion in any administrative, executive agency, or department, to deny license or sale upon any ground, much less the innocent pastime of dancing.

The consequence is that the sole duty of the commission, in the application of the several statutes to the several situations that may be presented to it, is like that of the executive, to "cause the laws . . . to be faithfully executed." Section 8, art. 6, Constitution. Neither the executive nor the administrative agency may construct a discretion to act upon it. So to do would be to supplant government by rule, by decree, or orders in council. Wells v. Childers, 196 Okla. 353, 165 P. 2d 371. Montesquieu, in his "Spirit of Law," expressed the thought that if the executive be joined with the legislative, so as to make the law to suit enforcement of it, there is no liberty. Sec. 1, art. 4, Const. Denial of permit to do a particular thing, lawful in itself, is not justified by requirements of statute applicable to other and different things. Enjoyment of the gains of one's own industry, lawful in itself, cannot rest upon a discretion so vague as to be in law undefined and unrestricted.

A belief or suspicion that an applicant for a license intends to violate the law will not warrant a refusal of license, in the absence of authority or discretion to deny a license upon such grounds. 33 Am. Jur. 60. Herein, there is no belief or suspicion that Cox, the applicant, will violate the law, but that his patrons will do so. It is, however, a criminal offense to drink any intoxicating liquor of any kind in any public place. 37 O.S. 1941 § 8.

The discretion conferred upon such a board must be exercised within legal bounds, and not as a result of whim or caprice in bestowal of a favor upon one person as a mark of friendship and in denial to another as a mark of displeasure, or, as in the case at bar, by granting a permit at one time, as in past to Cox, and denying a permit to him at a later date. The issuance of a license is not an arbitrary matter. Nicodemus v. State, 82 Okla. 152, 198 P. 847.

The Oklahoma Tax Commission assigns in brief a firm foundation for its denial of the permit. It is said to be one that naturally arises and that it is in keeping with peace, safety, and good morals of the citizenship of Oklahoma. Thus, the commission pleads the public policy and invites a look at the overall picture in the light of the contention. This court may as well consider and determine the public policy of this state as it relates to the manufacture and sale of "any intoxicating liquors, including beer." Prohibition Ordinance, O.S. 1941, p. 115; art. 1, sec. 7, Const.

The sale of beer in Oklahoma from and after the effective date of the Referendum Act of July 11, 1933, was predicated upon a hoax.* The manufacture and sale, within Oklahoma, of any intoxicating liquor, including beer, ale and wine, is illegal and unlawful.

There was approved, at a referendum election July 11, 1933, a prohibition enforcement act. It did not purport to be a constitutional amendment; it did not grant any right or privilege as to beer, but, to the contrary, by the provisions thereof, the manufacture and sale of beer in any form were prohibited absolutely. The Referendum Act (37 O.S. 1941 § 1) in part provides:

"It shall be unlawful for any person, individual or corporation to furnish . . .

_____

*A deception for mockery or mischief—Webster's New Int. Dictionary.

any spirituous, vinous, fermented, or malt liquors, or any imitation thereof, or substitute therefor, or to manufacture, sell, barter, give away, or otherwise furnish any liquors or compounds of any kind or description whatsoever, whether medicated or not, which contain more than 3.2 of alcohol, measured by weight, and which is capable of being used as a beverage."

An erroneous conception is indulged by the majority. It is that the clauses "which contain more than 3.2 of alcohol measured by weight, and which is capable of being used as a beverage," modify the terms "spirituous, vinous, fermented, or malt liquors, or any imitation thereof, or substitute therefor," and therefore it is not unlawful to sell spirituous, vinous, fermented, or malt liquors which do not contain more than 3.2 of alcohol measured by weight or which are not capable of being used as a beverage. The error of this conception was adjudged long prior to the adoption of the Referendum Act in Oklahoma. State v. Centennial Brewing Co., 55 Mont. 500, 179 P. 296. The erroneous conception indulged assumes, necessarily, that the enforcement act amends the prohibition ordinance—to illustrate, by the prohibition ordinance the manufacture and sale of "beer, ale, and wine" is prohibited altogether, without reference to alcohol content; whereas, if the conception be not erroneous, the sale of beer, ale, or wine, or of spirituous liquors of not more than 3.2 of alcohol is not prohibited. Spirituous, vinous, fermented, and malt liquors are terms of general use and each has a well-defined and understood meaning. Spirituous liquors means distilled liquors, 1 Woolen and Thornton, Law of Intoxicating Liquors, para. 7, as distinguished from fermented or brewed intoxicating beverages, Standard Dictionary; Black on Intoxicating Liquors, para. 3, and exemplified by whisky, brandy, and rum, 15 R.C.L. 249; Sarlls v. U. S., 152 U.S. 570, 38 L.Ed. 556. By the law, the sale of spirituous liquors is prohibited absolutely and without reference to the alcoholic content, unless the referendum or subsequent legislative act amended the prohibition ordinance or constitutional provision. But such was not the purpose of legislation, as evidenced by its title and text, and such is not the effect. The prohibition ordinance was ratified September 17, 1907. It has been in force since November 16, 1907. It is said to be self-executing. Ashcraft v. State, 68 Okla. Cr. 308, 98 P. 2d 60. By its terms it prohibits the manufacture, sale, and barter of any intoxicating liquor, including beer, ale, and wine. Ex parte Cain, 20 Okla. 125, 1 Okla. Cr. 7, 93 P. 974. By the terms of the ordinance it endures "until the people of the state shall otherwise provide by amendment of this Constitution and proper legislation." The people of the state may alter or amend their Constitution, but only by the method and in the manner prescribed in the instrument itself. 16 C.J.S. 28. A statute is not a constitutional amendment, even though the statute be adopted by a vote of the people. 16 C.J.S. 31; Simpson v. Hill, 128 Okla. 268, 236 P. 635.

The Constitution is the original and fundamental law. To permit a change in it without strict observance of the rules therein laid down would be a step in the direction of the destruction of the stability of government. 11 Am. Jur. 633; Granger v. City of Tulsa, 174 Okla. 565, 51 P. 2d 567. Such a change is pro tanto repudiation.

It seems to me that a duty devolves upon this highest judicial tribunal, if not upon the chief executive or administrative officers, that prevents the assumption of repeal of constitutional prohibition by mere legislative acts. Dove v. Oglesby, 114 Okla. 144, 244 P. 798, 132 A. L. R. 1186. "The Supreme Court on appeal has jurisdiction and will determine the constitutionality of a law although the cause can be decided upon other grounds". Memphis Street Ry. Co. v. Rapid Transit Co., 133 Tenn. 99, 179 S. W. 635. The Supreme Court of the United States will do so when "it is not even the principal object of the relief sought by plaintiff", Giles v. Harris, 189 U. S. 484; 4 C. J. 576; 4 C.

J. S. 1947; 3 Am. Jur. 310. The erroneous conception indulged by the majority leads to a contradiction in terms employed in the Referendum Act. Reduced to its simplest form, it amounts to this: The sale of spirituous, vinous, fermented, or malt liquors, not capable of being used as a beverage, is not prohibited.

The word "beverage" means a drink or liquor for drinking (Century Dictionary). Every one of the terms, "spirituous liquor", "vinous liquor", "fermented or malt liquor," has a well-understood and defined meaning. Every one of these liquors is not merely capable of being used as a beverage but is, in fact, a beverage, and so it is a contradiction of terms to speak of spirituous, vinous, fermented, or malt liquors not capable of being used as a beverage.

The grammatical construction of the Referendum Act does not admit of the application of the erroneous conception. Under the conception, liquors prohibited would include only spirituous, vinous, fermented or malt liquors which contain more than 3.2% of alcohol by weight, and which is capable of being used as a beverage, but in the connection in which they are employed, the words "any spirituous, vinous, fermented or malt" are adjectives, all modifying the noun "liquors," which is plural in number, whereas each of the verbs "contains" and "is" is singular.

The rule of grammatical construction is merely an aid in interpretation, so that if the text of the statute indicates a legislative intention contrary to that which would follow from the application of the rules of grammar, then the rule of grammatical construction must give way. But, in the absence of a clear intention discovered by the text, courts must elicit the purpose and intention of the statute from the terms and expressions employed, if that is possible, calling to aid the ordinary rules of grammar. Jay v. School Dist., 24 Mont. 219, 61 P. 250.

The erroneous conception indulged does violence to another rule of statutory construction. The last antecedent before either of the modifying clauses is "liquors". It is a rule of law as old as the law itself that a relative clause should be construed to relate to the nearest antecedent that will make sense. Traverse City v. Blair Township, 190 Mich. 313, 157 N. W. 81; Anno. Cas. 1918E, 81; English on Interpretation of Statutes, par. 414, or, more aptly stated, "by what is known as the doctrine of 'last antecedent', relative and qualifying words, phrases, and clauses are to be applied to the words or phrases immediately preceding, and are not to be construed as extending to or including words more remote, unless such extension is clearly required by consideration of the entire act." 36 Cyc. 1123.

It may be that no good reason can be advanced why malt liquors containing not more than 3.2% of alcohol should be under the ban, while a patent medicine containing not more than 3.2% of alcohol and capable of being used as a beverage is suffered to be sold. But this furnishes no reason for a construction of the language of the Referendum Act contrary to its manifest import. Expediency may have actuated the proponents of the manufacture and sale of beer, but it does not satisfy the requirements of law. Nor is it the province of a judge or court, executive or administrator, in construction or application of law, to govern official action or the performance of public duty by personal or political motives, appetites, likes, or dislikes of the law.

It is well settled that it is within the power of the people to define in constitutional provisions or prohibition ordinance, intoxicating liquors and to include within such definitions beverages which are in themselves innocuous or possessed of doubtful intoxicating qualities. This is so in order to avoid subterfuges and frauds and settle in law disputed issues that otherwise would arise as questions of science and of fact. 1 Woolen and Thornton on Intoxicating

Liquors, sec. 114; Purity Extract Co. v. Lynch, 226 U. S. 192, 57 L. Ed. 184.

The Supreme Court of the United States said:

" . . . When a state, exerting its recognized authority, undertakes to suppress what it is free to regard as a public evil, it may adopt such measures having reasonable relation to that end as it may deem necessary in order to make its action effective. It does not follow that because a transaction separately considered is innocuous it may not be included in a prohibition, the scope of which is regarded as essential in the legislative judgment to accomplish a purpose within the admitted power of the government."

The meaning of the Referendum Act (37 O. S. 1941 § 1) is perfectly clear. The furnishing of spirituous liquors, vinous liquors, fermented or malt liquors, as those terms are generally understood, is all declared to be unlawful and that, too, without reference to the amount of alcohol contained in any of them. This rule applies equally to "any imitation thereof or substitute therefor".

Every other kind of liquors or compounds "of any kind or description whatsoever, whether medicated or not," is likewise within the ban of the law as to "furnishing" and as to "manufacture, sale, and barter", if that kind of liquors or compounds contains more than 3.2% of alcohol measured by weight, and if that kind of liquors or compounds is capable of being used as a beverage. F. W. Woolworth & Co. v. State, 72 Okla. Cr. 125, 113 P. 2d 399.

This construction harmonizes the Referendum Act with other legislative acts such as 37 O.S. 1941 § 3, as to the unlawful sale or gift of intoxicating liquors to minors, and section 5, the unlawful furnishing of any spirituous, vinous, fermented or malt liquors to minors, lunatics, or drunkards; and section 6, inhibiting the keeping of a club room or other place where liquor, the sale of which is prohibited, is received, kept, and stored for the purpose of furnishing, distributing, or dividing such liquors amongst the members; and section 10, making it unlawful for any person to act as agent for any wholesale liquor house, brewery, or distillery for the purpose of distributing any of their liquors of any kind, whether it be spirituous, vinous, fermented or malt liquors, or any imitation thereof or substitute therefor, and wherein the payment of a retail malt liquor dealer's tax to the U. S. Government is declared to be prima facie evidence of an intention to violate the law.

This construction is harmonious with section 31, a part of the Referendum Act, by the provisions of which it is unlawful, in a place of business, amusement, recreation, public resort, or club room to possess more than one quart of spirituous, vinous, fermented or malt liquors or any imitation thereof or substitute therefor, or any liquor or compound of any kind or description whatsoever, whether medicated or not, which contains more than 3.2% of alcohol measured by weight; and section 32, making unlawful in a place of residence to possess more than, amongst other liquors, one cask of malt liquors or any imitation thereof or substitute therefor, or more than one cask of liquors or compounds of any kind or description whatsoever with intent to violate the prohibitory liquor laws.

This construction harmonizes with section 51, by the provisions of which it is unlawful to manufacture, ferment, or possess any compound, mixture, mash, wort, or wash fit for distillation or for the manufacture of beer, wine, distilled spirits, or other alcoholic liquors, the sale, barter, giving away, or other dispensing of which is prohibited by the laws of the State of Oklahoma; and section 56, by the provisions of which it is unlawful to knowingly permit the deposit in any house, building, or upon any premises or enclosure of any mash, wort or wash fit for distillation or for the manufacture of beer, wine, distilled spirits, or other alcoholic liquors. Bright v. State, 52 Okla. Cr. 89, 2 P. 2d 600. And section 71, by which the owner of real estate who permits the use of such

real estate for violating the law shall be guilty of misdemeanor and, in addition thereto, shall be liable to a penalty of not less than $100 nor more than $1,000 for each offense, to be recovered at the suit of the state and to become a lien upon the property and premises so used, subject to sale and satisfaction of the penalty for each day such property is so used.

This construction is in harmony with section 73, by which all places where any spirituous, vinous, fermented or malt liquors are manufactured, sold, bartered or otherwise furnished are kept, and all places where persons congregate for the purpose of drinking any such liquors are declared to be public nuisances subject to judgment and abatement. King v. State, 71 Okla. Cr. 158, 109 P. 2d 836; Territory v. Robertson, 19 Okla. 149, 92 P. 144; Gragg v. State, 73 Okla. 132, 175 P. 201.

This construction harmonizes with section 82, a part of the Referendum Act declaring the possession of specified quantities of any spirituous, vinous, fermented or malt liquors prima facie evidence of intention to violate the prohibitory liquor laws; and with the provisions of the prohibition ordinance by which the sale of "ale and beer . . . in all their forms, whether intoxicating or not, were prohibited". United States v. Cohn, 2 Ind. Terr. 474, 52 S. W. 38. Each of the sections of statute to which reference has been made is a part of the general law contained in the revision of Oklahoma Statutes 1941. Each must have a function to perform. They are in effect, whether enforced or not.

By the prohibition ordinance, the sale of any intoxicating liquors, including beer, is prohibited. Thus, by inclusion of beer with intoxicating liquors, beer is intoxicating, and since it is so by the highest of mandates, beer may not be rendered nonintoxicating by mere legislative act, general in its terms. Moreover, whether beer is in fact intoxicating or not, its manufacture and sale, by basic law, is prohibited, and that which is prohibited by basic law may not, directly or indirectly, be legalized by mere statute.

The definition of nonintoxicating beverages, Laws 1939, p. 513, sec. 1 (37 O. S. 1941 § 162), is general in its terms. Within provisions of that act, neither the spirituous, vinous, fermented or malted kinds of liquors are mentioned, nor are the words "beer", "ale", or "wine" used. The Act of 1939 relates to beverages of a general class. In order for that act to be constitutional or to have any function to perform, of necessity its provisions must be limited in scope to liquors or compounds *capable of being used as a beverage* and containing not more than 3.2% of alcohol measured by weight. Otherwise, the Act of 1939 conflicts with the Referendum Act of 1933 inhibiting the manufacture and sale of spirituous, vinous, fermented or malt liquors which are in fact beverages. And, while it may be considered that the Act of 1939, by inference, repealed prior acts, by no stretch of imagination or of law may it be considered that the Act of 1939 effected a repeal of the provisions of Constitution or of the ordinance prohibiting manufacture and sale of any intoxicating liquors, including beer, ale, and wine. It is by this construction alone that a contradiction in terms of the legislative acts may be avoided; that repudiation of constitutional provision may be prevented; that the Supreme Court may avoid the indulgence of an erroneous conception of law by accepting and acting upon the provisions of a statute otherwise in contravention of the Constitution.

The title of the Referendum Act indicates its purpose as a prohibitory enforcement act and not as an act to legalize the sale of beer.

To pretend one thing and do another has ever been a fraud on a power.

Courts will take judicial notice, as a general rule, of legislative journals and other facts of common knowledge. 31 C. J. S. para. 43. So doing, vol. 2 Journal, House of Representatives, 14th Legislature (1933) pp. 4315, 4316, 4317,

the executive message of Hon. Wm. H. Murray, Governor, in reference to H. B. 647 (the Referendum Act), used the word "beer" no less than seven times. And so, the measure was, by that generally recognized illustrious and venerable constitutional authority, designated as the "Beer Bill". But designation or recognition by state departments of that which is not, or executive or administrative error as to the force and effect of an act as an amendment of Constitution, cannot validate or prevent judicial inquiry into the validity, force, or effect of such legislation. 16 C. J. S. 30; Simpson v. Hill, supra. Inquiry reveals, upon a casual examination, that with the exception of wine, intended for the sacrament, the manufacture and sale of denatured alcohol, alcohol for scientific or manufacturing purposes, the sale of everything which falls into the fair import of the terms employed is prohibited absolutely.

The Referendum Act was clearly designed as one of suppression and not of supervision. It relaxed merely the alcoholic content of those things capable of being used as a beverage. It had nothing to do with the alcoholic content of liquors which were in fact beverages. Beyond cavil, the purpose indicated by the act was to aid in the enforcement of the prohibition law, and not to repeal it.

Long before either the Referendum Act or the Act of 1939 became the law, the legislative and judicial history had disclosed that the ingenuity of man can devise almost limitless means for evading a prohibition, that any beverage by name may be counterfeited, as in the instance of Bevo or Barette (Brown v. State, 17 Ariz. 314, 152 P. 578), and that the use of such general terms as intoxicating or nonintoxicating liquors only leads to confusion and a practical annulment of the law itself. But never before did the proponents of the manufacture and sale of any intoxicating liquors, including beer, infiltrate into legislative assemblies or into executive chambers to seek and secure, by a hoax*, the elements of which are fraud and ignorance, a nullification of constitutional provision by mere statutory enactment, designed by its terms to prevent the very antithesis of that which was in fact allowed.

Every intelligent citizen knows that beer has been and is being manufactured and sold within this state, as a result of the Referendum Act of July 11, 1933, and the administrative interpretation placed upon that act. Since, but not prior to the act, final judicial construction of the act has been carefully, if not fraudulently, avoided. Myrick v. Cochran, Supreme Court, No. 31546 [case dismissed]. County judges, mindful of their oaths to uphold and defend the Constitution, have refused to issue licenses for the sale of beer, cognizant of the rule that an ineffective or unconstitutional act, "though having the form and name of law, is in reality no law, but is wholly void, and in legal contemplation is as inoperative as if it had never been passed. It imposes no duties, confers no rights, bestows no power or authority on anyone, affords no protection and justifies no acts performed under it". State ex rel. Tharel v. Board, 188 Okla. 184, 107 P. 2d 542. Apparently the Tax Commission governed its action by that rule of law. Its members did not connive, in this case, in the manufacture and sale of intoxicating liquors by the issuance of the permit to violate the law.

The concluding clause of the Referendum Act, sec. 82, provides:

"This section shall not be construed in any way to legalize the keeping of any liquors for unlawful purposes, irrespective of the amount".

The terms of that act are designed to mark and relax, as will be seen by comparison of it with the prior act, the deadline between which bitters, drugs, patent proprietary medicines and nostrums, under whatever name or designation, may not become the vehicle for a continuation of the traffic in alcoholic

---

*A practical joke—Webster's New Int. Dictionary.

beverages. By terms of that act, the policy of the law is evidenced that these preparations, with alcoholic content of not more than 3.2%, would be so far neutralized by other ingredients as to render them practically harmless as beverages.

In State v. Hemrich, 93 Wash. 439, 161 P. 79, L. R. A. 1917B, 962, a prohibition law, including such terms as those of the prohibition ordinance and Referendum Act and using the phrase "intoxicating liquors including wine, ale, beer, and spirituous, vinous, fermented or malt liquors, and every other liquor or liquid containing intoxicating properties," was construed under the doctrine of the last antecedent, so that the phrase "containing intoxicating properties" modified the terms "other liquor or liquid" and did not modify any other of the preceding terms.

It is a criminal offense within Oklahoma to sell malt liquor or beer containing not more than 3.2% of alcohol measured by weight, and therefore neither Mr. Cox nor any other person, firm, or corporation should be licensed or permitted by any agency of the state to violate the law.

The inebrious element of all the enumerated liquors is alcohol. That is true of ale, beer, wine, and spirituous liquors such as whisky, rum, and brandy. The percentage of alcohol in these beverages differs greatly, ranging from a very low per cent in beer to a very high per cent in whisky. According to the Standard Dictionary, small beer has but 1.28% of alcohol; lager beer, schenk beer, and bock beer vary in alcoholic content from 2 to 7%. At the time of statehood, the general class of beer sold in this country ranged from 2.68% to 4.12% of alcohol and 95% of the beer manufactured and sold contained from 3% to 3½% of alcohol by weight. (Encyclopedia Brittanica 1910).

But, of course, since the prohibition ordinance and Constitution specifically name beer as forbidden, it will be granted that the designation includes beer of a high alcoholic content. But it has named beer, and that word comprehends Weiss and small beer as well as bock, lager, or schenk beer. And who shall say that less was meant than any or all of the known beers or drinks made by the process used in making beer, particularly in view of the law which used the relative phrase "imitations thereof and substitutes therefor"?

The percentage of alcohol in wine is from 7% to 25%. Can it be that in the use of the word "wine," as contained in the Constitution and prohibition ordinance, only high proof wines are meant? So with whisky, brandy, and rum, the alcoholic content differs, but they are all included in the words of statute "spirituous liquors" and their sale condemned, whether as to alcohol, they contain little or much. "Any intoxicating liquors of any kind" precedes and by terms includes the named liquors, "beer, ale, and wine". The named liquors are prohibited ex vi termini, regardless of their ability to intoxicate. They were prohibited because in the prohibition of intoxicating liquors in early days of American jurisprudence the question arose and the courts were divided as to whether the designation of a particular liquor, such as beer or ale or wine, in pleadings or in evidence, should be construed as meaning intoxicating liquors, and whether the particular liquor should be considered intoxicating as a matter of law or as a question of fact. State v. Carmody, 50 Ore. 1, 91 P. 446, 12 L. R. A. (N. S.) 828. By force of Constitution, that issue was resolved as a matter of law. But Mr. Black says:

"The preponderance of authority is to the effect that when the word 'beer' is used without any restriction or qualification, it denotes an intoxicating malt liquor; that when this occurs in an indictment or complaint or in the evidence, it is presumed to include only that specie of beverage; and that being taken in this sense, it will be sufficient, unless it is shown by the evidence that the particular liquor so described is nonalcoholic".

However the rule may be, by law in Oklahoma the crime consists in the sale

of intoxicating liquors; under our law the crime may be committed by selling ale, wine, or beer. So it is very evident what the law means when it uses the word "beer". It is not a matter of the alcoholic content of a beverage known as beer; it is merely the application and enforcement of law by virtue of the Constitution existing. The word "beer" as used in the prohibition ordinance does not mean an intoxicating liquor only, such as may by subsequent legislative act be rendered nonintoxicating, but it includes as well the beverage within a general class of the statutory nonintoxicating beverages when it is a fermented malt beverage, that is, if the liquor be beer, as defined and historically known by standard lexicographers and by courts, its traffic is forbidden.

The article that Cox planned to sell, and for which he paid a license tax and for the sale of which he seeks a permit, and for which he has provided himself a malt revenue stamp, he names as "3.2% beer". It falls within the well known definition of beer. Whether it be intoxicating or not, the appellant's act in selling it would be criminal and of course the state's public policy forbids issuance of a permit to perform a criminal act.

In Sparger v. Harris, 191 Okla. 583, 131 P. 2d 1011, this court held, "regardless of legislation on the subject, the sale of intoxicating liquors in the state is prohibited and therefore illegal". As in State v. Danenberg, 151 N. C. 718, 66 S. E. 306, 26 L. R. A. (N. S.) 890, this beverage that appellant seeks to sell "is made by those who make beer, sold by those who sell beer, drunk by those who drink beer. It looks like beer, smells like beer, tastes like beer". It is advertised as beer and certainly if it is beer, its sale is prohibited.

Webster defines beer as a fermented liquor made from any malted grain with hops or other bitter flavoring matters. The Encyclopedia Brittanica says, "It is a beverage obtained by process of alcoholic fermentation mainly from cereals, chiefly malted barley, hops, and

water". Joyce, on Intoxicating Liquors, par. 19, says beer is "a fermented liquor chiefly made of malt", while Woolen and Thornton, para. 34, adopt Webster's definition. Undoubtedly, beer is the common name for all malt liquors, whether of the intoxicating or nonintoxicating kind. Brown v. State, supra.

Curiosity may be satisfied as to the cause of delay in the Supreme Court's adjudication of this question. The statute, para. 162h, as to the issuance of licenses in counties provides "the district court shall be vested with final appellate jurisdiction". It was sought to let the matter rest there; in cases on appeal, there have been compromises and dismissals. Myrick v. Cochran, No. 31546. However, lapse of time and usage do not cure constitutional defects of a mere legislative act. 16 C.J. 151. Despite delays "there can be no question as to the construction," United States v. Cohn, 2 Ind. Terr. 474, 52 S.W. 38, even though "this country was flooded with lager beer . . . brought in by the carloads and (even though) drunkenness and rowdyism in their worst forms prevailed throughout the land." Idem. Our prohibition ordinance was a Federal law for years before it was adopted by the people of this state as a part of their fundamental law and the particular word of most interest here, towit, "beer," had been construed by the Federal courts long before the people of the state appropriated that word together with its context. The rule of law is well settled that in the adoption of a statute or ordinance of another sovereignty or state, the construction placed upon such statute or ordinance by the courts of its origin is taken and adopted as much as the statute itself, especially when the evil sought to be remedied is the same.

A fortiori, when fortified by logic and reason, in 1899 the Court of Appeals of the Indian Territory, a United States Court, in the Cohn Case decided that "ale and beer . . . in all their forms, whether intoxicating or not, were prohibited." Thus the meanings of these

words were defined eight years before the people of Oklahoma appropriated these words and their setting and incorporated them into basic law.

An enumeration of a prohibited liquor without any qualification extends to it in all of its forms, intoxicating as well as nonintoxicating. The inclusion of beer with any intoxicating liquors in the prohibition ordinance, therefore, does not exclude beer which falls within the general class of beverages, by the legislative act of 1939 declared to be nonintoxicating when containing as little or less or not more than 3.2% of alcohol measured by weight. State v. Spalding, 61 Vt. 505, 17 Atl. 844, prohibiting cider; Luther v. State, 83 Neb. 455, 120 N.W. 125, 20 L.R.A. (N.S.) 1146, prohibiting malt tonic; Kettering v. City of Jacksonville, 50 Ill. 39, prohibiting beer; Brown v. State, supra, holding "It is the stuff of which it is made and not its name (Barette) that gives it place among the prohibited liquors named in the Constitution (fermented malt liquors)."

This is the gravamen of good morals presented in the case at bar. It is one affecting the integrity and legitimacy of our government. It extends to the legislative act of 1939. While the Legislature may define and legalize as nonintoxicating these beverages containing not more than 3.2% of alcohol, which may as a scientific fact contain a marginal intoxicating percentum of alcohol when taken in limited quantities, and these beverages in general, by statute made to be nonintoxicating, may include the alcohol content of beer, nevertheless, beer continues to be beer as known to the framers of the Constitution and the people who adopted it, and by law, the manufacture and sale of 3.2 beer is prohibited. The constitutional provision is complete within itself. It requires no vitalizing statute or procedure for enforcement. Ex parte Cain, 20 Okla. 125, 1 Okla. Cr. 7, 93 P. 974. The supreme law is beyond the control of the Legislature. 16 C.J.S. 47. Its enforcement is enjoined upon the executive, art. 6, sec. 8, Const.

Existing licenses and permits by which beer is being manufactured and sold would seem to be jeopardized by the decision in Arie v. State, 23 Okla. 166, 100 P. 23. Therein, as to an existing license to sell such beverage, the period for which it was issued not having expired when the State of Oklahoma was admitted to the Union, it was held the license was revoked on admission of the state because the prohibition article had become effective. Ex parte Smith, 24 Okla. Cr. 415, 218 P. 708; Antonelli v. State, 3 Okla. Cr. 58; 107 P. 951; Wayne v. United States, 138 Fed. 2d 1; Davis v. State, 71 Okla. Cr. 82, 108 P. 2d 200. The laws sleep but never die.

This is a voice crying in the wilderness to sustain a Constitution, a device of law and order, the standard of right and wrong, the instrument of power, though use of it may yet be neglected by the vicissitudes of politics or as a result of greed. Were I a prophet, or the son of a prophet, or possessed of the qualities of a Jeremiah, I would know that, with litigation to follow, this court will be worn and borne down, without a lofty and impelling idea to guide it.

Courts must cannonize the Constitution, or be lost in the forces of nature. The judges' working tool is the law. They need not await presentation of it to them. If they do not have it, they should find it, from the best available sources. In our ultimate mission, given bucolic certainty, whom shall we serve—a litigant, the law, or ourselves? Upon answer to this imperative question depends the safety of the state. If life is to have meaning and not become the senseless sport of chance, actions must be measured by a definite standard. The corporate state's moral law is the Constitution. Whether the state is an end in itself is dependent upon the pattern and adherence to the pattern.

No longer ago than November 20, 1945, in Casualty Reciprocal Exchange v. Sutfin, 196 Okla. 567, 166 P. 2d 434, this court held:

"Authority to amend cannot be delegated to an administrative board. Associated Industries of Okla. et al. v. Industrial Welfare Comm. et al., 185 Okla. 177, 90 P. 2d 899; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; F. W. Woolworth Co. v. United States (2d Cir.) 91 Fed. 2d 973."